UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ANTONIO ESCALONA,

                                   Petitioner,

                                                          **OPINION & ORDER**
                                                          **CV-06-6769**

        -against-


LAWRENCE SEARS,

                                   Respondent.
----------------------------------------------------- X
FEUERSTEIN, J.

        On January 14, 2004, a judgment of conviction was entered against petitioner Antonio

Escalona (petitioner) in the Supreme Court of the State of New York, Kings County (Starkey, J.),

upon a jury verdict finding him guilty of eight (8) counts of criminal contempt in the first degree

and stalking in the fourth degree, and imposition of sentence. On December 20, 2006, petitioner

filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

        For the reasons set forth herein, the petition is denied and the proceeding is dismissed.


I.      BACKGROUND

        A.      Factual Background

        The following facts were taken from the trial transcript (T.):

                1.      The People's Case

        The complaining witness Harolyn Brayboy ("Brayboy") testified that she and petitioner

started a relationship approximately ten (10) years prior to the date of the trial and remained in a

relationship for four (4) to five (5) years. (T. 65). At the time they met, petitioner lived with his grandfather in the same building as Brayboy. (T. 64). According to Brayboy, during the beginning of 1995, when she was pregnant with their daughter, Antonia Escalona, and petitioner was living with her and her older daughter, Tamara Richardson, she believed that she and petitioner should separate because petitioner "was not putting forth his best effort. He was not employed. He was not assisting * * *." (T. 65-67). In addition, Brayboy testified that while she was pregnant she learned that petitioner had been unfaithful to her and had fathered a child with someone else. (T. 67-68). Nonetheless, Brayboy remained with petitioner because they "were in a relationship and just had a baby," and she thought they could resolve their problems. (T. 68).

Brayboy testified that a couple of years later she again asked petitioner to leave because "things were not going well." (T. 66-67). She testified that in June 1999, when she learned that petitioner had had a verbal confrontation with her older daughter, Tamara, she questioned him about it and petitioner punched her in the jaw. (T. 69-70). According to Brayboy, in November 1999 she asked petitioner to move out permanently because she had "had enough of his infidelities and various different problems we were having. We were not getting along and it's not good for the children to be in a situation like that." (T. 70-71).

Brayboy testified that on November 26, 1999, after petitioner had moved out, petitioner came to her apartment and banged on the door screaming obscenities and saying "open the door, I want to speak to you." (T. 72). According to Brayboy, she refused and when she looked through the peephole of the door, petitioner was menacing her with a knife. (T. 72). She testified that he also scratched the word "bitch" in her door. (T. 72). At the time of this incident, Brayboy had an order of protection against petitioner which was issued by the Family Court. (T.

2

72). As a result, petitioner was arrested once Brayboy reported the incident to the police. (T. 72). Thereafter, Brayboy was issued an order of protection against petitioner from the Criminal Court. (T. 73). Petitioner was released from jail while the criminal case was pending. (T. 73).

Brayboy testified that on March 18, 2000, while the order of protection was in effect, she received telephone calls from petitioner threatening to kill her and to "get her" and calling her names such as "bitch" and "whore." (T. 73-74). According to Brayboy, on that date, after she informed petitioner that their daughter was ill and that she could not "deal with [him] right now," petitioner appeared at her apartment and demanded to see his daughter. (T. 74). When Brayboy told petitioner that their daughter was sleeping, he "kind of put his foot and kind of held the door so [she] couldn't close [it]. [Petitioner] says [sic] I should – I can get you right now," and pushed her. (T. 74-75).

Brayboy testified that on March 25, 2000, while the order of protection was in effect, petitioner came to her apartment building and called out to her: "You know I'm going to get you. When you come outside, I'm going to get you." (T. 75-76). The following day, petitioner followed Brayboy to a store and then hid behind her building peeking out at her. (T. 76). According to Brayboy, she reported the incident to the police, but they were reluctant to write a report because petitioner did not touch her or "do anything." (T. 76-77). While she was reporting the incident to the police, her older daughter called her to tell her that petitioner called and said that he was watching Brayboy talk to the police and "they [were] not going to get him any way." (T. 76-77).

Petitioner was arrested on March 29, 2000. (T. 77-78). According to Brayboy, petitioner called her several times from central booking, accused her of trying to ruin his life and told her

3

that he was "going to get [her]." (T. 78).[1]

On November 11, 2000, petitioner entered a plea of guilty to criminal contempt in the first degree and criminal contempt in the second degree. Following the plea allocution and prior to sentencing, petitioner repeatedly called Brayboy, notwithstanding the order of protection and plea agreement. (T. 79-80). In addition, on Thanksgiving Day of 2000, petitioner called Brayboy and told her that she "can wind up just like" her nephew, who had been murdered. (T. 80-81). Brayboy reported, and testified in court about, petitioner's telephone calls. (T. 82). After she testified in court, petitioner called Brayboy a "fucking bitch." (T. 83).

On May 7, 2001, a judgment of conviction was entered upon petitioner's plea of guilty to criminal contempt in the first degree and criminal contempt in the second degree and imposition of sentence to two (2) concurrent terms of imprisonment, the longer of which was a term of two (2) to (4) years incarceration.[2] The certificate of conviction was entered into evidence. (T. 120). In addition, Brayboy was issued another order of protection against petitioner for the period from

---

[1] During the trial, the jury was instructed as follows:

> "insofar as evidence was received concerning events that were said to have occurred between [petitioner] and [Brayboy] prior to [October] 13th [2002], those were received solely for the purpose of putting the relationship as of October 13th into prospective [sic]. And it may be considered also as motive for the [petitioner], as to whether or not he had a motive to act as he is alleged to have acted, beginning on or about October the 13th. But may not be considered as making it more likely, sort of speak [sic], that he committed the crimes charged here. Except, insofar as he may be corrected, in connection with motive, and awareness of the status of the relationship, the history of the relationship." (T. 107).

[2] The Appellate Division, Second Judicial Department affirmed petitioner's judgment of conviction. People v. Escalona, 300 A.D.2d 505, 751 N.Y.S.2d 540 (2d Dept. 2002). On April 2, 2003, the Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Escalona, 99 N.Y.2d 654, 760 N.Y.S.2d 118, 790 N.E.2d 292 (2003).

May 7, 2001 until May 7, 2008. (T. 83-84). The order of protection provided that petitioner was not to have any contact with Brayboy. (T. 85).

Petitioner was released from prison in March or April 2002 into the custody of the Immigration and Naturalization Service (INS) pursuant to an immigration detainer. (T. 37) Petitioner was released in August 2002 and was on parole in October 2002. (T. 29, 38, 109).

Brayboy testified that in October 2002, she resided at 738 Stanley Avenue, Apartment 2D, Brooklyn, New York with her two daughters and was employed at Memorial Sloan-Kettering Cancer Center located at 1275 York Avenue in Manhattan. (T. 57-60, 86). Her home telephone number was (718) 272-1478 and her work telephone number was (212) 639-2712. (T. 58-59).

Brayboy testified that on October 13, 2002, at approximately 7:00 p.m., she was with her boyfriend Michael, when petitioner called and requested to speak with their daughter. (T. 86-87). When Brayboy told petitioner that their daughter was not home, he said "oh, you send my daughter away so you can entertain. And who is that guy and why is he there." (T. 87). According to Brayboy, she saw petitioner across the street through her window. (T. 87). Brayboy testified that before she hung up on petitioner, he said "oh you're a whore, you're a fucking whore. I'm going to get you." (T. 87). Brayboy received numerous other telephone calls from petitioner that night, calling her names and threatening her. (T. 88). In addition, Brayboy testified that in between the phone calls, petitioner went to her apartment and knocked on the door a few times, demanding that she come out and talk to him or let him in. (T. 88). Brayboy did not call the police that night because she did not want to go through the whole court process again and thought petitioner would just go away. (T. 88-89, 113).

Brayboy testified that on October 14, 2002, she was at work when she received a

5

telephone call from petitioner calling her a "fucking bitch" and saying that he "was going to get [her]." (T. 89). According to Brayboy, when she asked petitioner not to call her at work, he responded that he was going to make her lose her job just like she made him lose his and that she had "better watch out." (T. 89). On cross examination, Brayboy testified that she did not make a complaint to the police regarding petitioner's conduct on October 14, 2002. (T. 114).

Brayboy testified that on October 15, 2002, she observed petitioner through her apartment window riding his bicycle up and down the street outside her apartment building and looking up at her window. (T. 90). According to Brayboy, petitioner then called her and said "oh, you're afraid of me. You got out of the window because you saw me pass by. You closed your curtain because you saw me." (T. 91). Petitioner called Brayboy several more times that evening and all of the calls were threatening. (T. 91). Brayboy testified that she called petitioner's parole officer to inform him that petitioner was calling her, banging on her door and threatening her. (T. 91).

Brayboy testified that on October 16, 2002, petitioner called her several times and she "believe[d] [she] saw him out of the window." (T. 92). However, she could not recall what she observed petitioner doing outside. (T. 92). Upon reviewing her testimony before the grand jury, Brayboy testified that petitioner called her at home and said "oh you didn't go to work. You are so afraid of me you didn't go to work today," indicating that he was somehow watching her. (T. 93).

Brayboy testified that on October 17, 2002, petitioner called her at approximately 8:00 a.m. and said that he could get her if he wanted to and he could kill her and go back home to Panama and "they would never find him." (T. 93-94).

Parole Officer Edward Lee testified that he was petitioner's parole supervisor. (T. 29-30).

6

According to Lee, on October 17, 2002, after speaking with Brayboy and conferencing with his supervisor, a parole warrant was issued and petitioner was taken into custody during his scheduled parole meeting. (T. 32-33). Petitioner was advised that he was being arrested for violating his special conditions of parole, i.e. for harassing and contacting Brayboy. (T. 33). According to Lee, petitioner denied doing anything and started "to act out physically." (T. 34). Following two parole hearings, at which Brayboy testified, petitioner's parole was revoked. (T. 34-35).

Petitioner continued to contact Brayboy after he was arrested. (Brayboy: T. 95; Henry Haegele, administrative manager for the New York City Department of Corrections: T. 128-130). According to Brayboy, on October 19, 2002, petitioner called her early in the morning and said that he hopes that she is happy, she is trying to ruin his life, and "he could have gotten me if [he] really wanted to." (T. 95, 103-105). On cross examination, Brayboy testified that she did not recall petitioner threatening her during that phone call. (T. 105-106).

Brayboy testified that on October 21, 2002, "I believe I got a phone call [from petitioner]. I got a phone call from [petitioner]." (T. 96). She further testified that petitioner said "something threatening," but she did not remember exactly what he said. (T. 96). On cross examination, Brayboy testified that petitioner said that he was going to make her lose her job just like he lost his job. (T. 106).

On cross examination, Brayboy also testified that petitioner contacted her from prison during his incarceration. (T. 107-108). In addition, she testified that petitioner contacted her between August 2002 and October 13, 2002, but she did not keep a record of those calls. (T. 110).

7

At the close of the People's case, defense counsel moved to dismiss the indictment "on the grounds that the People * * * failed to establish [petitioner's] guilt, beyond a reasonable doubt, as a matter of law." (T. 133). In addition, defense counsel specifically moved to dismiss the following counts of the indictment: (a) counts fifteen (15) and nineteen (19), on the basis that there was no evidence to indicate that petitioner was anywhere near Brayboy on the dates in question, (T. 134-136); and (b) counts twenty-one (21) through twenty-six (26), charging petitioner with criminal contempt in the second degree, on the basis that the wording of those counts in the indictment was defective and that those counts were duplicitous, (T. 136-139).

2.    The Defense

Petitioner testified in his own defense. Petitioner testified that in 1991 he was convicted, upon his plea of guilty, of sale of a controlled substance in the third degree, for which he was sentenced to one (1) day in jail and five (5) years probation. (T. 141). On cross examination, petitioner testified that the basis of that conviction was that on July 27, 1990 he was arrested for selling cocaine to an undercover officer. (T. 172).

Petitioner testified that he "got together" with Brayboy in 1993, although he knew her before then because they lived next to each other. (T. 142). Petitioner testified that his relationship with Brayboy fell apart when he started cheating on her before the birth of their daughter on May 20, 1995. (T. 142). According to petitioner, he left Brayboy for another woman, with whom he also had a child. (T. 142-143, 163).

Petitioner testified that in 1999 he was arrested and charged with criminal contempt for violating an order of protection issued by the Family Court. (T. 144). On direct examination,

8

petitioner testified that on November 1, 2000, he pled guilty to criminal contempt in the first degree for making one (1) telephone call to Brayboy and admitted to that crime. (T. 144-145). However, on cross examination, petitioner testified that on March 18, 2000, he repeatedly called Brayboy notwithstanding the order of protection. (T. 178-181). According to petitioner, he only called Brayboy to speak to his daughter. (T. 179-180).

Petitioner testified that pursuant to the plea agreement he was to complete "a program" and, upon completion, the charge would be dropped to a misdemeanor and he would be sentenced to three (3) years probation. (T. 145, 181). If petitioner did not complete the drug program, he would be sentenced to two (2) to four (4) years incarceration. (T. 145). Petitioner testified that he could not attend the program because he was subject to an "immigration hold." (T. 145, 181-182). According to petitioner, as a result of his failure to attend the program, he was subsequently sentenced to two (2) to four (4) years incarceration. (T. 146, 185-186). However, petitioner also testified that "they" said that he was being sentenced to the enhanced sentence because he violated the order of protection insofar as Brayboy said that he had called her on November 26th and threatened her. (T. 146). On direct examination, petitioner denied talking to Brayboy while he was incarcerated. (T. 146-147). However, on cross examination, petitioner testified that he called Brayboy numerous times between November 1, 2000 and December 4, 2000, while he was incarcerated and notwithstanding the order of protection, but claims that he only called to speak to his daughter. (T. 182-183).

Petitioner testified that in 2001, while he was incarcerated at Rikers Island, he was convicted, upon his plea of guilty, of reckless endangerment. (T. 158, 173). According to petitioner, "they" said that there was a fire in the waste paper basket, "[b]ut the fire was out, but

9

it was a lot of smoke accumulation." (T. 159, 173). There were fifty-one (51) inmates in the dorm at the time of the fire and three (3) inmates, including petitioner, were charged with arson. (T. 159, 172). Petitioner was sentenced to one (1) year for that crime. (T. 159-160).

Petitioner testified that he was released from prison into the custody of the Immigration and Naturalization Service. (T. 147). He was released from INS custody on or about August 28, 2002. (T. 147). Upon his release, he reported to parole. (T. 147).

Petitioner denied that he had any contact with, or made any telephone calls to, Brayboy on October 13, 14, 15 or 16, 2002. (T. 148-150). He also denied owning a bicycle or riding around the block in front of Brayboy's apartment building on October 13, 2002. (T. 148). He denied any of the conduct of which Brayboy accused him between the period from October 13, 2002 through October 17, 2002. (T. 149, 160).

Petitioner testified that on October 17, 2002, he was arrested when he reported to his parole officer. (T. 150-152). He denied ever being in the vicinity, or in the presence, of Brayboy at any time on that date. (T. 157). According to petitioner, when he asked why he was being arrested, Lee only responded "Why was you in for? Why you were in jail for?" (T. 152). Petitioner testified that he was not served with the charges for which he had been arrested until October 18, 2002. (T. 152-153).

Petitioner admitted that on October 19 and 21, 2002 he called Brayboy from Rikers Island. (T. 153). According to petitioner, the purpose of his telephone call on October 19, 2002 was to find out why Brayboy was "doing all this." (T. 154). Petitioner denied threatening Brayboy during that three (3) minute and fifty (50) seconds telephone conversation. (T. 154). Petitioner testified that on October 20, 2002, he dialed Brayboy's telephone number instead of

10

his grandfather's number by mistake and hung up the phone without speaking to Brayboy. (T. 155). Petitioner also admitted calling Brayboy at work, but denied threatening her. (T. 155-157). According to petitioner, he called Brayboy at work to find out what he ever did to her. (T. 156). Petitioner denied ever being in Brayboy's presence, or even near her, between October 19, 2002 through October 21, 2002, as he was incarcerated on Rikers Island at that time. (T. 157-158).

On cross examination, petitioner testified that in October 2002 he was living by himself in a room on the third floor at 458 Wyona Street. (T. 160-161). His cousin, Antoine Escalona, lived on the second floor of that location. (T. 160-161).

Petitioner further testified on cross examination that between November 12, 1999 and November 14, 1999, he repeatedly called Brayboy, notwithstanding the order of protection. (T. 176-177). Petitioner denied threatening Brayboy, but admitted calling her names, including "fat bitch". (T. 177-178). Petitioner was arrested following those incidents, but was released on his own recognizance. (T. 178).

Petitioner also testified on cross examination that an order of protection was issued on May 7, 2001, effective until May 7, 2008, which prohibited him from any contact with Brayboy, including telephone contact and contact through third parties. (T. 185-188).

At the close of the defense, defense counsel moved for a trial order of dismissal on the grounds that the People, as a matter of law, failed to establish petitioner's guilt beyond a reasonable doubt. (T. 210). In addition, defense counsel renewed his application, made at the end of the People's case, to dismiss specific counts of the indictment. (T. 210). The People agreed to dismiss the aggravated harassment charges contained in Counts twenty-seven (27) through thirty-three (33) of the indictment. (211). Before the trial court ruled on the remainder

11

of defense counsel's motion, defense counsel withdrew all of his motions to dismiss counts of the indictments after conferencing the case with petitioner. (T. 226).

### 3. Rebuttal

At the close of the defense, the People requested leave to call a representative of Verizon to testify regarding telephone records from petitioner's telephone number in light of his denial that he made any telephone calls to Brayboy on October 13 and 14, 2002. (T. 200). Defense counsel objected to the rebuttal on the basis that the telephone records had not been previously provided to the defense. (T. 200-204). According to the People, Verizon had initially provided it with the wrong records, so that the proper records were only received by the People during the defense case. (T. 202-203). The trial court granted the People's request to reopen their case and present rebuttal. (T. 226).

Telephone records for telephone number (718) 346-6794, originating from a land line at 458 Wyona Street, Brooklyn, New York, were admitted into evidence over defense counsel's objection. (T. 230-231). Gerard Connell, a staff custodian for Verizon Communications, (T. 228), testified that the subscriber's name for those records was "Antonio Escalona." (T. 231). Connell further testified that on October 13, 2002, at 9:15 p.m. and 9:17 p.m., respectively, two (2) telephone calls were made to (718) 272-1478, (T. 231-232), which Brayboy had testified was her home telephone number, (T. 58-59). In addition, on that date, one (1) telephone call was made to Sloan Kettering at 8:31 a.m. (T. 233). On October 14, 2002, numerous telephone calls were made to (718) 272-1478 between 1:14 a.m. and 3:48 a.m. (T. 232). On that date there were also three (3) telephone calls to Sloan Kettering. (T. 233). On October 15, 2002, two (2)

12

telephone calls were made to (718) 272-1478. (T. 234).

At the close of the People's rebuttal case, defense counsel again moved for a trial order of dismissal on the ground that the People failed to prove petitioner's guilt as to each and every count of the indictment beyond a reasonable doubt. (T. 235). The trial court denied defense counsel's motion. (T. 235).

### 4. Verdict and Sentence

Following a jury trial, petitioner was found guilty of eight (8) counts of criminal contempt in the first degree (counts one, three, six, ten, sixteen, eighteen, twenty, twenty-two) and one (1) count of stalking in the fourth degree (count twenty-four) and not guilty of three (3) counts of criminal contempt in the first degree (counts two, fourteen and fifteen). (T. 324-326). On January 14, 2004, petitioner was sentenced, as a predicate felony offender, to four (4) concurrent sentences of two (2) to four (4) years for the three (3) offenses committed on October 13, 14 and 15, 2002, and for the "course of conduct" conviction, to be served consecutively to another four (4) concurrent sentences of two (2) to four (4) years for the four (4) offenses committed on October 16, 17, 19 and 21, 2002. (S. 4, 7-8). Petitioner was also sentenced to a concurrent determinate term of imprisonment of one (1) year for the stalking conviction. (S. 7).

### B. Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*: (1) that the evidence was legally insufficient to support his convictions on three (3) counts of criminal

13

contempt in the first degree and the verdict was against the weight of the evidence; (2) that the trial court's _Sandoval_ ruling deprived him of a fair trial; (3) that telephone records that had never been disclosed to the defense prior to trial were improperly admitted as rebuttal; and (4) that his consecutive sentences were illegal since the same acts that constituted the criminal contempt convictions for October 16, 17, 19 and 21 also constituted the "course of conduct" count. On December 19, 2005, the Appellate Division, Second Department affirmed the judgment of conviction, finding, _inter alia_, (1) that petitioner's legal insufficiency argument was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2); (2) that, in any event, the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (3) that the verdict was not against the weight of the evidence; and (4) that petitioner's remaining contentions were without merit. People v. Escalona, 24 A.D.3d 687, 805 N.Y.S.2d 845 (2d Dept. 2005). On April 10, 2006, the Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Escalona, 6 N.Y.3d 847, 816 N.Y.S.2d 753, 849 N.E.2d 976 (2006).

On or about December 20, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging (a) that the evidence was legally insufficient to establish his guilt of three (3) counts of criminal contempt in the first degree; (b) that the trial court's _Sandoval_ ruling, allowing him to be cross-examined as to three (3) of his prior convictions and their underlying facts, deprived him of a fair trial; (c) that the admission of telephone records that had not been disclosed to the defense prior to trial on rebuttal deprived him of a fair trial; and (d) that the imposition of consecutive sentences was illegal since his conviction of criminal contempt in the first degree based on a "course of conduct" encompassed all seven (7) dates for which he was separately convicted of criminal contempt in the first degree. Respondent filed his return on

January 30, 2007.

II.    DISCUSSION[3]

   A.    Legal Sufficiency Claim

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order for federal habeas review to be procedurally defaulted, the state court's reliance on state law must be "clear from the face of the opinion." Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted). If a state court holding contains a plain statement that a claim is procedurally defaulted then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

---

[3] There is no dispute that petitioner's claims have been fully exhausted in the state courts, as required by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254.

The Appellate Division, Second Department rejected petitioner's legal sufficiency claim

on appeal as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2), then ruled

that, in any event, that claim was without merit since the evidence, viewed in the light most

favorable to the prosecution, "was legally sufficient to establish the [petitioner's] guilt beyond a

reasonable doubt." People v. Escalona, 24 A.D.3d at 687, 805 N.Y.S.2d 845. Since the

Appellate Division clearly invoked a state procedural rules as a basis for its rejection of

petitioner's legal sufficiency claim, and petitioner has not alleged cause for the default, actual

prejudice, or that it would be a fundamental miscarriage of justice if that claim were not

reviewed, that claim is barred from federal habeas review.


B.    Standard of Review under AEDPA[4]

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254,

governs applications of incarcerated state court defendants seeking federal habeas corpus relief.

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met the

procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable

---

[4] The state court's rejection of petitioner's remaining contentions as "without merit,"
People v. Escalona, 24 A.D.3d at 687, 805 N.Y.S.2d 845, constitutes an adjudication on the
merits, and, thus, the AEDPA standard applies to petitioner's remaining claims. See, e.g.
Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir. 2004) (holding that it will be presumed that a
claim was adjudicated on the merits where it was one of the remaining contentions that the
Appellate Division stated was "without merit" and that, in such case, the habeas petition should
be reviewed under the AEDPA standard rather than de novo); Jenkins v. Artuz, 294 F.3d 284,
291 (2d Cir. 2002) (holding that a disposition of a claim as being "without merit" constitutes an
adjudication on the merits, thus triggering AEDPA deference).

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006), cert. denied sub nom Spears v. Spitzer, 127 S.Ct. 951, 166 L.Ed.2d 725 (2007) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. 2254 (d)(1). Alternatively, a federal habeas court may "'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Williams, 529 U.S. at 413, 120 S.Ct. 1495). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495; see also Wiggins, 539 U.S. at 520-521, 123 S.Ct. 2527 (holding that the state court's decision must have been more than incorrect or erroneous; its application must have been "objectively unreasonable"). Under the AEDPA,

determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

### 1. Evidentiary Rulings

Petitioner alleges that the state court erroneously admitted (1) evidence of his prior convictions on cross examination; and (2) telephone records that had not previously been disclosed to him on rebuttal. An erroneous evidentiary ruling does not amount to a constitutional violation unless the evidence in question was so extremely unfair that its admission violated fundamental conceptions of justice. Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (citing Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 [1990]). In order to constitute a denial of due process, the prejudicial evidence erroneously admitted must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. (internal quotations and citations omitted). In short, the erroneously admitted evidence "must have been crucial, critical, highly significant.'" Smith v. Greiner, No. 99-CV-5230, 03-MISC-0066, 2003 WL 24015053, at * 4 (E.D.N.Y. Sept. 15, 2003), aff'd, 117 Fed.Appx. 779 (2d Cir. 2004). Federal error does not exist were the state court merely violated its own laws of evidence. See Lewis v. Jeffers, 497 U.S. 764, 780.

### a. Sandoval/Molineaux Ruling

Prior to the trial, the trial court conducted a Sandoval/Molineaux hearing to determine whether the People would be permitted to inquire of petitioner, should he take the stand, regarding

18

the general nature of his relationship with Brayboy and the following three (3) prior convictions and their underlying acts: (1) his 2000 conviction, upon his plea of guilty, of criminal contempt in the first degree and criminal contempt in the second degree; (2) his 2000 conviction, while incarcerated, of reckless endangerment in the second degree; and (3) his 1991 conviction of criminal sale of a controlled substance in the third degree. (Transcript of Hearing Proceedings on December 16, 2003 (H.) at 3-14). Defense counsel indicated that at trial, defendant would concede that he was convicted of criminal contempt in the first and second degree and was sentenced to jail and that he had a "very bad relationship" with Brayboy, but otherwise objected to the admission of evidence regarding the prior convictions and underlying acts. (H. 6, 8, 11-12). After hearing arguments from both sides, the trial court ruled that the People would be permitted to inquire as to the three (3) convictions and their underlying acts, but with only a limited inquiry concerning the events that gave rise to the older narcotics charges. (H. 13-15).

"The <u>Sandoval</u> ruling is a matter of state law as to the admissibility of evidence, the purpose of which is to provide the defendant with a prospective ruling on the possible use of defendant's prior bad acts by the prosecution for the purpose of impeachment." <u>Ayala v. Ercole</u>, No. 06-CV-1747, 2007 WL 1135560, at * 14 (E.D.N.Y. Apr. 17, 2007). Since the admission of a prior conviction is an evidentiary ruling, it "is only redressable in a federal habeas corpus proceeding if there is a showing that the particular errors were of constitutional magnitude. * * *. [Citation omitted]. Evidentiary errors must be 'so pervasive as to have denied [petitioner] a fundamentally fair trial." <u>Hunter v. Greiner</u>, No. 99 CIV. 4191, 2000 WL 245864, at * 4 (S.D.N.Y. Mar. 3, 2000) (quoting <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985)); <u>see also Ayala</u>, 2007 WL 1135560, at * 14 (holding that federal habeas courts are limited to the review of state court convictions where

there has been a constitutional error so great that the criminal defendant was denied a fair trial * * * and that a writ of habeas corpus should issue only where the petitioner can show that the evidentiary error deprived him of a fundamentally fair trial); William v. Greiner, No. 02-CV-1116, 03-MISC-0066, 2003 WL 23198759, at * 11 (E.D.N.Y. Nov. 26, 2003) (holding that generally, state court rulings on evidentiary matters, including rulings on the permissible extent of cross-examination should the defendant testify, are a matter of state law that do not raise constitutional issues and are not reviewable by a federal habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness).

Since petitioner testified at trial, his Sandoval claim is cognizable on habeas review. Cf. Luce v. United States, 469 U.S. 38, 43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (holding that in order to raise a claim of improper impeachment with a prior conviction, the petitioner must have testified at trial). The trial court did not abuse its discretion under state law in allowing the prosecution to cross-examine petitioner regarding his prior convictions, since the prior commission of those crimes revealed "a willingness or disposition on the part of [petitioner] voluntarily to place the advancement of his individual self-interest ahead of principle or of the interests of society," People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413, 417-418 (1974), and, thus, was "relevant to suggest his readiness to do so again on the witness stand." Id.; see also Ayala, 2007 WL 1135560, at * 15 (finding that the trial court did not abuse its discretion in permitting the petitioner to be cross-examined regarding his prior conviction for attempted criminal contempt resulting from his failure to follow a court order and the rules of the judicial system because that conviction spoke to the petitioner's honesty and credibility in testifying at trial); People v. Richins, 29 A.D.3d 1170, 1172, 814 N.Y.S.2d 816 (3rd Dept. 2006) (holding that the trial court did not abuse its discretion in

permitting inquiry into the defendant's two previous drug convictions as those convictions were indicative of his willingness to place his own interests above those of society); People v. Brown, 290 A.D.2d 251, 735 N.Y.S.2d 536, 537 (1st Dept. 2002) (holding that the trial court properly permitted the prosecutor to elicit the defendant's prior conviction of attempted criminal sale of a controlled substance, since that prior narcotics conviction was probative of the defendant's willingness to place his interests above those of society); People v. Litterello, 141 A.D.2d 566, 567, 529 N.Y.S.2d 706 (2d Dept. 1988) (holding that the trial court did not improvidently exercise its sound discretion in ruling that the defendant's prior conviction for reckless endangerment, and the underlying circumstances thereof, were admissible into evidence). Moreover, the fact that petitioner's narcotics conviction was more than ten (10) years old at the time of the trial did not, by itself, require preclusion of impeachment with regard to that conviction, see People v. Smilovich, 157 A.D.2d 809, 810, 550 N.Y.S.2d 411 (2d Dept. 1990), and the state court properly permitted limited inquiry as to that conviction. A review of the transcript of the proceedings demonstrates that the trial court's Sandoval ruling was reasonable and not constitutional error.

In any event, the admission of evidence of those prior convictions was not of such a constitutional magnitude so as to violate petitioner's constitutional right to a fair trial, particularly in light of the overwhelming evidence of petitioner's guilt. See, e.g. see also Senor v. Greiner, No. 00-CV- 5673, 2002 WL 31102612, at * 13 (E.D.N.Y. Sept. 18, 2002) (finding the petitioner's Sandoval claim to be without merit where, inter alia, even assuming the trial court erred in permitting cross examination about the petitioner's prior drug conviction, the petitioner failed to demonstrate that the ruling influenced the jury's verdict in any way in light of the abundant evidence of petitioner's guilt).

b.      Admission of Telephone Records on Rebuttal

"Under New York law, a 'party has the right to impeach or discredit the testimony of an opponent, and such evidence is always competent. He may contradict the testimony of a witness as to any matters upon which he had been called to give evidence in chief, provided it is not collateral to the issue.'" Velazquez v. Fischer, 524 F.Supp.2d 443, 451 (S.D.N.Y. 2007) (citing People v. Harris, 57 N.Y.2d 335, 345, 456 N.Y.S.2d 694, 442 N.E.2d 1205 (1982)). "In New York, '[t]he general rule is that the cross-examiner is bound by the answers of the witness to questions concerning *collateral matters* inquired into solely to affect credibility.'" Thomas v. West, No. 03 Civ. 1443, 2007 WL 541476, at * 16 (S.D.N.Y. Feb. 22, 2007), report and recommendation adopted by 2007 WL 2456755 (S.D.N.Y. Aug. 29, 2007) (citing People v. Beavers, 127 A.D.2d 138, 514 N.Y.S.2d 235, 237 (1st Dept. 1987)(emphasis in original)). "Evidence is not collateral when it is relevant to some issue other than general credibility, and specifically, where it 'is offered for the purpose of disproving facts set forth by a witness for the opposing side on direct examination.'" Velazquez, 524 F.Supp.2d at 451 (citing Beavers, 127 A.D.2d at 141, 514 N.Y.S.2d 235). Evidence that is relevant to the very issues that the jury must decide is always relevant. Id. Ultimately, under New York law, it is within the sound discretion of the trial court whether to permit the introduction of evidence on rebuttal. See Id.; N.Y. C.P.L. § 260.30(7).

Although, as conceded by respondent, the telephone records were more properly admitted on the People's direct case, the trial court did not abuse its discretion in permitting the evidence, which was not available at the time of the People's direct case through no fault of the People, to be admitted on rebuttal. The telephone records were directly relevant to the issue of whether petitioner called Brayboy in violation of the order of protection, "the very issues that the jury [had to] decide,"

22

Velazquez, 524 F.Supp.2d at 451, and, thus, were not merely collateral to the issue of petitioner's general credibility. "The fact that the evidence also tend[ed] to impeach [petitioner's] credibility does not render the evidence collateral." Id. (citing People v. Patterson, 194 A.D.2d 570, 571-572, 598 N.Y.S.2d 328 (2d Dept. 1993)).

In any event, even if the admission of the telephone records on rebuttal was erroneous as a matter of state law, any such evidence did not deprive petitioner of a fundamentally fair trial in light of the overwhelming evidence of petitioner's guilt. See, e.g. Thomas, 2007 WL 541476, at * 16 (holding that the petitioner could not show that the purported erroneous evidentiary ruling denied him a fair trial in light of the considerable evidence of his guilt); Cunningham v. Bennett, No. 02 CV 4635, 2005 WL 1162475, at * 6-7 (E.D.N.Y. May 16, 2005) (holding that the petitioner was not entitled to habeas relief on his claim that he was denied a fair trial by the erroneous admission of certain evidence on rebuttal in light of the overwhelming evidence of the petitioner's guilt).

### 2. Consecutive Sentences

Petitioner was convicted of seven (7) counts of criminal contempt for his separate acts against Brayboy on October 13, 14, 15, 16, 17, 19 and 21, 2002 in violation of the order of protection. In addition, petitioner was convicted of "engaging in a course of conduct" against Brayboy "over a period of time," i.e. between October 13th and October 21st 2002, in which he "intentionally place[d] or attempt[ed] to place a person for whose protection [an] order [of protection] was issued in reasonable fear of physical injury, serious physical injury or death * * *." N.Y. Penal Law § 215.51(b)(ii). Petitioner was sentenced to four (4) concurrent indeterminate sentences of two (2) to four (4) years for the three (3) convictions for acts committed on October 13,

14 and 15, 2002, and for the course of conduct conviction, to be served consecutively to another four (4) concurrent indeterminate sentences of two (2) to four (4) years for the four (4) convictions for acts committed on October 16, 17, 19 and 21, 2002.[5] Petitioner contends that the imposition of consecutive sentences violated N.Y. Penal Law § 70.25(2), the Double Jeopardy Clause, and his due process rights.[6]

New York law authorizes consecutive sentences where the criminal acts constitute separate offenses, but prohibits consecutive sentences based on the same criminal act. N.Y. Penal Law § 70.25. Specifically, N.Y. Penal Law § 70.25(2) provides, in pertinent part:

> When more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences, * * *, must run concurrently.

Under New York law, "[e]ven if the material elements overlap, consecutive sentences are permissible where the People demonstrate that the offenses are based on separate and distinct acts." Palacios v. Burge, 470 F.Supp.2d 215, 224 (E.D.N.Y. 2007) (quoting People v. Parks, 95 N.Y.2d 811, 815 n. 2, 712 N.Y.S.2d 429, 734 N.E.2d 741 (2000)). The Double Jeopardy Clause only bars consecutive sentences that are imposed in violation of state law. See Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (holding that the Double Jeopardy Clause is violated only if the sentence imposed a "greater punishment than the legislature intended").

---

[5] Petitioner was also convicted of stalking and sentenced to a concurrent determinate term of imprisonment of one (1) year for that conviction. (S. 7). However, that sentence is not at issue.

[6] Petitioner does not contend that his sentence was excessive or constitutes cruel and unusual punishment in violation of the Eighth Amendment.

The seven (7) offenses against Brayboy committed on October 13, 14, 15, 16, 17, 19 and 21, 2002 in violation of the order of protection constitute separate offenses for which consecutive sentences could have been imposed. Moreover, the state court's conclusion that petitioner's Double Jeopardy and due process contentions were without merit was not contrary to, or an unreasonable application of, clearly established Supreme Court law. Although part of an extended "course of conduct," the offenses committed by petitioner on October 16, 17, 19 and 21 were based on acts separate and distinct from the acts committed on October 13, 14 and 15 and each of the individual acts committed by petitioner on those dates were not material elements of the "course of conduct" conviction.

III.    CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: October 8 , 2008
       Central Islip, New York

25

Copies to:

Antonio Escalona, *pro se*
04A0456
Franklin Correctional Facility
P.O. Box 10
62 Bare Hill Road
Malone, New York 12953

Kings County District Attorney's Office
Renaissance Plaza at 350 Jay Street
Brooklyn, New York 11201
Attn:  Diane R. Eisner, A.D.A.